The next matter, number 25-1007, Frank Thompson v. Carl Wilson. At this time, would counsel for Appellant Thompson please introduce himself on the record to begin. Good morning, Your Honors, and may it please the Court. My name is Edward Wenger, and I'm here on behalf of Mr. Frank Thompson, the plaintiff appellant in this matter. With the Court's permission, I'd like to reserve three minutes for rebuttal. You may. Three principles frame the inquiry in this case, which is whether 24-7, every minute on the minute, electronic tracking of lobster boats can coexist with the Fourth Amendment's prohibition of unreasonable searches and seizures. The first, and I'll quote from Justice Brandeis roughly 100 years ago, judges are obligated, as subtler and more far-reaching means of invading privacy have become available to the government, to ensure that the progress of science does not erode Fourth Amendment protections. Fast forward roughly 100 years, we have Carpenter, the Chief Justice's opinion, where he emphasizes that everybody has a legitimate expectation of privacy to the whole of their movements. Cases that have interpreted Carpenter have said that basically Carpenter cemented a line between short-term tracking of public movements, such as the type of stops that lobster boats were traditionally used to, sort of the spot checks to check licensing and whatnot, and the prolonged tracking that can reveal intimate details. That's a criminal case. It is a criminal case. That's what that's about. It's about the law enforcement activity, and we can't just follow people around. That's Carpenter. That's Jones. I understand that. But this is a case about, well, I understood at least at the district court level, a closely regulated industry. And then the question seems to be entirely a different one, which is, is there a substantial reason administratively? Because obviously if they were doing this for a criminal justice purpose, it would be a different case. But they're not. Well, you're correct, Judge Anfram. But at the same time, the principle remains is that there is a qualitative difference. And I think that that's important for this case because part of what the— What do you mean a qualitative difference? There's a qualitative difference between the types of small stops that you would get whenever you have somebody checking the licensure of a lobster boat. Let me ask you this. As I understood the history of this, prior to the availability of the kind of GPS as you were describing a minute ago, you had to keep logs. Correct. And those were supposed to say where you were, what you were doing, what was your location, in whatever manner that was, right? And that was an effort to get at the problems that the government has identified that they're trying to solve for. Protecting the right whales. What's the fish? What's the lobster population stock at any given point? And what they're going to say, I think, is we were already asking for this. We were doing it in a way that was sort of less than optimal. And so we had a garbage-in, garbage-out problem. We can only figure stuff out based on the data we have. And the data we have, because we're relying on people to fill out logs, are going to have errors. And now we can do better. Correct. So I would like to get into those justifications a little bit later. But I think the fundamental issue that we're discussing here is that as technology continues to progress, and I take Your Honor's point about carpentry being a criminal case, but there is still an expectation of privacy that matters, even in the administrative search context. And whenever you do have the difference between spot checking versus 24-7 monitoring, there is a difference and there is an invasion of privacy that's qualitatively different. But weren't you, I guess my point was, and I probably didn't say it that well, weren't you in some sense supposed to do a version of 24-7 monitoring before the GPSs through keeping travel logs of what the boats were doing? Yes and no. And part of the reason is that the VTRs, the vehicle tracking logs, were supposed to tell you whenever you were lobster fishing, where you were, where your trawl was at. And in our briefing we laid out all the information there. This is different. This is actually tracking non-commercial activity. Those trackers need to be on whether or not that boat is being used to teach your son or your grandchild how to pilot a boat. That's really the difference. So I guess one question we should decide or think about today is whether a reduced expectation of privacy under the burger test still applies to lobstermen using their vessels, personal vessels, right, to teach their son how to drive or to go on a picnic somewhere. If I understand Your Honor's question correctly, it's whether or not the non-commercial use of these vessels also sort of has a reduced expectation of privacy. I think the answer is probably when it comes to that, the best way to look at it is that there's a reduced expectation of privacy in traveling versus automobiles. But it's still not the type that's completely obliterated. The closely regulated industry inquiry basically asks whether or not you have no expectation of privacy, and that's the reason why people can do the types of 24-7 searches. So that's actually a very important difference that I think is one that even the district court identified. He basically said that in response to – But that's a choice. You have licensed your lobster boat. You have brought it within the closely regulated industry. And now you want to use it for other things. You don't have to do that. That's your business boat. You can use it for private activity. You could have a different boat. But you don't want to. You want to use that boat. And there's no prohibition on using that boat. But that doesn't strike me as a reason that that should be to unravel the regulatory scheme to get at the things that are trying to assess the core use of the boat, which is its lobstering feature. So I do think that that's actually – to put that into the context of what's going on in the main lobstering industry, a lot of these folks do use these boats for much more than just that, much more than just their trade, much more than just the commercial activity. The other thing that I think would be an issue, Judge Aframe, is that the more and more that you say you've chosen to do this, you've selected a license, the more and more you start running into what I think is an unconstitutional conditions problem, where all of a sudden you have to basically say, I give up my entire expectation of privacy, whether or not I want to go ahead and take a joyride, whether or not I want to go ahead and move. With that boat. With that boat. Correct. You want to have a different boat. You can do whatever you want. And there isn't going to be a GPS on it. I mean, you're in a business. This is your business vehicle. And you're choosing to use it for other things. No one's making you do that. Well, I think the problem with sort of that is that it is a bit of a misconception about what this industry looks like. You're talking about folks who have passed these boats down, might only have one, from generation to generation. You're talking about folks who are not rich, folks who don't have the capacity to actually have more than one boat, have their pleasure boat, have their commercial boat. This is a boat that's actually something that is part of the lifestyle of the Maine lobstering community. And there are a lot of folks, including some of my clients in this case and in others, that are the fifth generation of lobster fishermen. So that really is, it goes much more to, it's not like you have. How do we align this all with Berger then? I mean, I know you've said in your brief, oh, you should say that this is a non-closely regulated industry. I haven't heard you say that. So let's assume it is for right now. How do we do this when the goal, the substantial interest is good data? And so you could say you need to use a log. That's not going to be good data. You can turn it on and off if you want to. But we know people won't turn it back on, not necessarily out of bad motive. They just will forget. Again, we have bad data. And so what I understand is they say our real interests have suffered because of bad data. And now we have a way to get good data. And your response is, sorry, you can't do it. No, no, not at all, Your Honor. I think my response is that Patel changed the inquiry when it comes to the Berger test. And primarily with what you're describing as Berger step two is whether or not this type of warrantless surveillance, if you will, is necessary to reach the regulatory goal. And what Patel says is that this is no longer a rational basis. How would you define the regulatory goal here? He has used the stock. Yes, absolutely, the stock. So the conservation of stock, and we all agree that that is an absolute worthy goal that satisfies Berger step one. So the question is whether or not 24-7 monitoring of commercial and non-commercial activities. When your friend stands up here a minute from now and says the data is bad, if these other options that have been put out there, we're not going to get good data, we know that just based on how humans operate, the data will be substandard. Does that make it necessary? I mean, they'll say that makes it necessary. Why is that wrong? Because, well, for the first is it goes to the actual question of the court's role in applying the Berger test and the Patel test now, and that is it's no longer a rational basis test. And if you look at Justice Sotomayor's opinion there, she actually did look very closely into whether or not it made sense, whether or not what it was, the data that the, in that case, the city of Los Angeles was trying to get, was actually going to reach their goal, and whether the lack of having that data would fatally undermine the regulatory scheme. I want this. If we say, no, you can't do it, how are they going to reach their goal if their other methods are unreliable? Well, I think that, so part of the reason is actually testing whether they're unreliable. And it's not a blank check. It's not a rubber stamp. And part of that is whenever you think about lobster stock. Lobsters are in the bottom of the ocean. The real inquiry is where that lobster stock is located. You want to figure out how much is left so you don't overfish. What happens, all you're doing, and this is something that the Mexican Gulf fishing case out of the Fifth Circuit really sort of laid out, is the only thing that this GPS tracker does is tell you where a boat is on the top of the water at any given time. It doesn't tell you much as far as where they are. It certainly tells you an awful lot less if you're tracking whenever people are not lobstering. So in the interest of trying to figure out whether it's necessary. All right, take the right whales. I know something about the right whales. So there's concern about the lines in the water, and the boats are going to stop at their buoys, and the GPS is going to provide data about where they're stopping, which will suggest there's a buoy, which will suggest there are lines there, which suggests that area is one that's at risk to the right whales. And that is important information for people who are dealing with that problem. And even the way you describe the information, Judge Aframe, the information that you want is where those buoys are, where those lines are. It doesn't matter nearly as much where those boats are moving. So the question is when you're talking about this fundamental right to privacy that you have in the whole of your movements, the question that I would have for the commissioner is why don't you track where the pots are? Why don't you track where the traps are? Why don't you do a better job and require the buoys to be better marked or have those tracked? You can get to that same information and get to that same sort of realizing the regulatory goal without trampling on people's right to privacy, particularly whenever they are taking part in noncommercial activities. Can we circle back quickly to your reading of Patel, which is I take it is that Patel sort of transformed this test into one of more of strict scrutiny. Is there any circuit support for that, not in this circuit, but anywhere else that Patel indeed defined this test differently? This has actually been something that I think is still percolating through the courts, especially in this area. I haven't seen any courts that have... Because the problem I have with the sentence you rely on Patel, it really is a characterization of the argument. I mean, that's literally what it says. The city claims that affording hotel operators any opportunity for pre-client review would fatally undermine the scheme's efficacy, and then it cites the petitioner's brief. So that's not the court speaking. That's the court saying what the petitioner said. Correct. Well, the court is still saying what the petitioner said, but they're still applying something akin to that because they go on further on and they don't just rubber stamp. I'm seeing that I'm out of time. If with permission, I'd like to...  So they still, if you actually look at what the court is doing, they are applying something, and this is what Justice Scalia picked up on in his dissent, they're applying something much more akin to a least restrictive means test. And I think that someone who's obviously in dissent and pointing out what he thinks the problem is with the opinion, I think that's a fair reading because what did not happen in Petel... So when you say least restrictive means, when they say we need better data than what we would get from those other ways, you're just saying they're wrong about that? Well, I would say it's something that the court has to look into, and I would say on this record they are wrong, and they should be rejected on that point because, again, if you want to access stock, if you want to protect the right whales from the chains or the ropes that are attached to the buoys, you look at the bottom of the ocean. You look to see where the traps are. That's a much better indicator of stock, and it's a much better indicator of where these lines could actually interfere with right whale migration than it is to look at 24. The assumption is that the lobstermen are going to their buoys and boats are sitting there because they're checking them. There may be an alternative way, but this is also one alternative way to track where they're fishing. But under Petel, it just can't be one of many alternatives. It's a blunderbuss to get at that information. It has to be something that's not going to interfere with your fundamental right to privacy in all of your movements. And that's the point is that they have to be more circumspect. That's what the Fourth Amendment commands. And to that point also, the tracking itself just tells you where that boat is on the water. So if someone is slowing down to pick up a pot or someone is slowing down because their son is looking at a fantastic sunrise or something like that, this GPS tracking requirement can't tell the difference. So in and of itself, this is not getting the type of data that they say it is getting. I see that I'm out of time. I'm happy to answer any more questions, or I will... Thank you. You do have rebuttal time. Thank you, counsel. At this time, would counsel for the appellee please introduce herself on the record to begin? May it please the Court. Assistant Attorney General Valerie Wright for the appellee. I'd like to start by answering Mr. Wenger's question that he said he would ask the commissioner, which is why not look at the bottom of the ocean and track where the pots and the lines are. So it's very important to understand how this data is going to be used. When the tracker pings once per minute, it can track the location of the boat every minute. As it slows down and hauls traps or even just sets traps, lobster vessels have a very distinctive pattern of movement when they're doing that. So the computers that analyze the data can take those plot points, that's all the responder is sending, is where it is at any certain time, and from that they can glean what length of lines that vessel is fishing in a particular location. They can deduce from that how many lines are likely involved in that particular trawl, how many traps are attached to that trawl. So the information that Mr. Wenger is considering, is suggesting that the commissioner should be looking for, is exactly the information that DMR anticipates receiving as a result of this regulation. So what he just told us is, but there are other ways that you can do that that won't impact the privacy interests he's concerned about. I don't know what other ways we could do that at this point, especially ways that don't severely burden the lobstermen. They're out there hauling hundreds of traps a day. They work incredibly fast, which is why the tracker has to ping once per minute. The ping rate analysis explains all that. So the current vessel trip reporting requirements don't require them to enter into a report every day where every single trap is located, because that would just be really burdensome for them to do. The vessel trip report only requires them to provide one latitude and longitudinal point from where the majority of their fishing was that day. The electronic tracker device is going to provide that lat-long point every minute that the vessel is underway, and it does it without burdening the lobstermen at all with having to enter any data. So it's a... Certainly, I have not seen an appellant suggest a better technology to achieve this without burdening the lobstermen and without adding significant cost. This is a very simple device. It works with cell phone technology. When it's out of range, which it would be in parts of the ocean, it just stores up its data, and when the vessel gets back in range, it sends it up to the confidential depository. The Council says in sort of a general fashion that a better method would be to monitor the buoys or track the buoys. Is there technology that can do that? Not that I'm aware of, Your Honor. The buoys are certainly visible. They're required to be visible and to be marked and to be identified with the particular lobstermen's markings and identification. But how you would track their location, unless you attached some sort of device to the buoy itself, but I haven't seen any technology yet that would do that. I'm not aware of any. So, Your Honor, as the Court said a decade ago in Rivera-Corraliza v. Morales, when assessing the constitutionality of a warrantless administrative search, context is key. And the context in this case is that the State of Maine's Department of Marine Resources needs to gather more thorough and accurate information that it has had before about where commercial lobster vessels are fishing and the nature of the fishing in that area, the density of the gear, the density of the lines. And that's because when another regulator, let's say, that has a different mission and a different task before it, approaches DMR and says, we're thinking of doing such and such, is this going to interfere significantly with the commercial lobster industry? And DMR says, yeah, you know, we think we've got major lobster grounds right in that spot. The other regulator's next question is going to be, well, what's your evidence of that? The strength of the advocacy that the Department of Marine Resources or the Atlantic States Marine Fisheries Commission or any of the other Atlantic states with lobster fisheries, the strength of their ability to advocate for lobstermen to continue to have access to their fishing grounds, fishing grounds which, by the way, are constantly on the move, especially as water temperatures rise and lobsters move further out into the ocean and further north. Their ability to advocate for the lobstermen to continue to have access to those areas is strengthened by the empirical data. You kind of just glided over a minute ago, because I understand everything you just said, and it makes sense to me. He was talking about, well, do it another way. And so you kind of glided over, well, why can't you put a GPS on the buoys? What do you have to show? I mean, you're not doing that. I imagine the record isn't going to say much about why you're not doing that, but what are we supposed to think about as we get into the law of this, which is the necessary component? That may be a thing you could do. That may not be. I really have no idea. But is it enough under the law that he has postured some other way that might get at the interest that's less intrusive? What are we supposed to think about legally? No, Your Honor. I believe that the law under Berger and Patel is that if the regulator has articulated the need for why what it wants to do with this regulation is necessary to support its regulatory goals and the work it has to do, then it's under no obligation to show, for instance, that that's the best way or the least intrusive way to do it. That's simply not something that I see in any of the case laws. That seems to me boiling down to what the legal issue is here based on what I just heard. So your point is necessary to the interest doesn't mean the only way or even the best way. Oh, no. Absolutely not, Your Honor. Is it sufficient correlation? I'm sorry, Your Honor? Is it sufficient correlation? Between the necessity and this regulation? Absolutely. Is that what we're supposed to look at? Is there a sufficient or adequate correlation between the regulation and the goal? Yes, absolutely. And there absolutely is here because as the Addendum 29, including the Ping Rate Analysis, lays out very well, the Commission has been wrestling with this for years and trying to figure out how to get the level of complete and accurate data it needs to do its job. And they did a lot of scientific research to figure out that if they put this device on these vessels, on each of these vessels, and they figured out that the minimum ping rate they need is once per minute in order to capture the smallest, the shortest trawls that are currently legally used in federal waters. So they didn't just sort of make this up and say, oh, well, we think if we put this thing on there and one minute sounds like a good rate. Your argument is necessary means effective. It is an effective way to achieve your goal. Not the only way, maybe. I don't know. Yeah, right. No, I'm sure someone could think of some other way and probably develop some technology someday. But that's right. If it's going to get the regulator to the goal that they need to get to to do their job, then Berger says then it's necessary. Which is an odd, I mean, not really the common use of necessary. Necessary seems to me to be a word you usually use when you say, like, the only way. That's the only way. It's the necessary way. So I'm wondering what to, you know, this word necessary, I guess, is the troubling part of this case for me because I know how courts have interpreted it. Sure. But it does seem to have a connotation of the only way. I think part of what is, where that comes into play is all of what's baked into the Berger test, which is the fact that this is a closely regulated industry. I mean, how they, what the traps look like, how many they can set, where they can set them, how many can be on a particular line in a particular part of the ocean. Sometimes it's a minimum of five. Sometimes it's a maximum of 50. And so, you know, there are so many regulations that govern this, and so the expectation of privacy that the commercial vessel operator has is extremely reduced. It's not zero. I'm not saying it's zero, but it is extremely reduced. So all of those things are kind of baked into this Berger test. That's the background and the context of the Berger test. So I think that's why necessary perhaps doesn't have the same, doesn't carry quite the same weight that it might in a different context. I see I have about a minute, if there are no questions pending. I'll just point out that Mr. Thompson, by the way, did not plead in his complaint that he actually uses his commercial vessel for any personal use, and he's the only appellant before you today. He did acknowledge in his complaint that, the plaintiffs all acknowledged in the complaint that they do not use their commercial lobster vessels for personal use in federal waters. None of them, Mr. Thompson did not actually plead that he uses his vessel for personal use. Does this only report when you're in federal waters, or is it reporting? It has to ping at once per minute whenever the vessel is underway. It pings whether it's in federal waters or not. That's correct, Your Honor. It goes down to once every six hours when the boat has been tethered for a period of time and remains stationary. Is there confidentiality rules around this, like law enforcement can't get this data without a search warrant? Is that right? And what are the other limitations on sharing of it? Sure, so the Atlantic Coastal, I'm going to forget what it is, the statistics program, they go by whatever the state law is of the state that generated the data and contributed the data to them. And then Maine has a statute that we cited that applies to this. The DMR has its own statute for confidentiality, and that is Title 12, MRS 6173, that any statistical information about the fisheries that the commissioner collects must be protected as confidential and can only be publicly released in an aggregated, de-individualized format. Is that part of your response to his privacy concern, is that the uses of this are quite circumscribed? Yes, the uses of this, the data can only be used in a public way, in an aggregate form, de-individualized, and they're very careful about how they do that. They're cognizant of the fact that if it's known that there's only one lobsterman who fishes in this particular area, then they need to not reveal that because they know what that will lead to. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the amicus party please introduce himself on the record to begin? He has a five-minute argument. Good morning, Your Honor. Sean Donohue from Amicus Atlantic States Marine Fisheries Commission. I'd just like to start emphasizing that confidentiality point. The Atlantic Coastal Cooperative Statistics Program has been around for 30 years. It protects fisheries information from both federal agencies and state for all kinds of fisheries. It's extremely rigorous, as Ms. Wright was explaining. It does not release information that would identify individual fishermen. Very strong record. It's subject to federal data integrity requirements, as we explained in our brief, and they're a very solid record of success in maintaining confidentiality. I'd like to emphasize that the vessel tracking program that Maine has adopted was the product of an interstate process that stretched over years and involved a pilot program. It involved input from all the states in the lobster fishery, scientists, fishery managers, the federal government. It was not adopted lightly, and it reflects an understanding of what would provide, at the least burden on the industry and at a reasonable cost, the information that is critical, as the addendum repeatedly said, for these various important management purposes, including the core scientific task of characterizing the lobster stock, which is changing dramatically. Specifically, as we explained in our brief, in New York there used to be a thriving lobster industry. The catch in 2016 is about 3% of what it was 20 years earlier. The southern New England stock is severely depleted now, and in Maine there is a clear movement of the stock offshore toward cooler waters. And so it's not enough to kind of wait until there's a crisis. These data require careful assessment over time, and so it's just critical for that reason alone. Then there's also the whale interactions. That problem, unfortunately, is not going to go away, and having this more granular data is critical there. Do you know anything about his point that there are less intrusive available means? I think I do, and I think that those have never been identified. The idea that you could have some kind of electronic signal on each lobster trap, there are thousands and thousands. I think that would be, among other things, prohibitively expensive. It just wouldn't work. I'm not aware of any other. I think the addendum explains why existing methods had just not, and this is not a problem that was new, it was recognized that we didn't know how to characterize the stock, and you can't manage properly without knowing where the activity. It's really important to recognize that federal water is just a vast, vast area. So for all kinds of reasons, having that data about where the catch is actually occurring that this program provides is critical, and it will become more critical as more of the fishery moves into those vast federal waters. I guess I'd like to just also emphasize, I think, I don't read Patel as having fundamentally changed the Fourth Amendment law on how the closely regulated doctrine works. I read Berger as having looked at the New York junkyard statute and kind of made a judgment about whether what New York was doing was reasonably necessary, given the objectives. I think when we're working in the Fourth Amendment, I think putting reasonableness in there, I think here the addendum and the work that Maine has done to implement it shows why this program really meets that standard, that it provides the information that is required for multiple important imperatives without going further than that. And I guess I'll close with just pointing to our brief. The other two amicus briefs and Maine's brief on just the very, very extensive nature of the regulation that already exists for this fishery. There are, for a lot of fisheries, provisions for human monitors, that is actual people on the boat to assess the catch and sort of monitor it. That would obviously be very costly and dramatically more intrusive, but the fact that there are so many provisions like that, including for lobster, is a testament to the great public interest in how these resources are used. So we'd ask that the court affirm the district court's judgment. Thank you. Thank you. Thank you. At this time, would counsel for the appellant please reintroduce himself back on the record? He has a three-minute rebuttal. Pardon me? Ed Wenger again for the plaintiff appellant. Just a few small points that I'd like to make, and one that we haven't talked about yet is Berger Step 3, which basically says that you have to have some sort of stand-in for the warrant requirement, which includes letting the people know who are subject to these regulatory searches that the searches are going to be properly constrained in a defined scope. Again, to reiterate, we're talking about 24-7 electronic tracking, commercial, non-commercial. There is no constraint on the scope of time. Where does the scope part come from? I mean, they know they have clear information without discretion about what's going to happen. I thought that's what Berger was about. Where is scope? Patel and some of the other cases that have looked into this third, they actually do talk about the extent to which you have to have a well-defined scope. And you can't define scope as tracking everywhere all the time forever. Let me push you on Patel before you sit down. So what Patel says is the argument was we need the element of surprise. That's why we need to have this rule. And the court said you will still have the element of surprise because you can go to a pre-compliance review officer, ex parte, no one will know. You will maintain surprise. So it seems to me that the problem there was their interest that they articulated could still be vindicated. The only thing you've said is something about that they could somehow mark all the buoys or measure the floor. So when I go to the record, what am I going to see about you explaining how that can be done and still maintain what they care about because that's, to me, what Patel is saying. They cared about surprise. They can still have it. They've told us what they care about, and they've put in a lot of information about why this is necessary. What's in the record that shows it's not? To remind you, Judge Afram, this was decided on a motion to dismiss, and that actually underscores the reason why the district court got this wrong, is the question you're asking is what sort of other record could we put in there? We had no opportunity to do that because the district court applied the pre-Patel rational basis test. They said the commissioner said this is something they want. The commissioner is now going to get that. Patel would have come out the other way. What's out there? Pardon me, ma'am? What kind of technology or what kind of system, alternative system, is out there that you know of? Every single person in this room, Judge Thompson, who has an iPhone, can drop and say, here's where I am. Here's my GPS pen. There are ways to do this. I'm not just making up some sort of science fiction idea. There are ways, and it is the burden of. But that seems completely like all you'll get from that is when people choose to do it. It has no enforcement mechanism. You won't know when they're doing it, when they're not. The whole point of this seems to be good data, and good data is to take the recording requirement off the lobsterman and put it on something that just is going to do it without anyone having to do anything. To that point, Judge Aframe, the record evidence here, which we have, is that lobstermen, whenever they fill out these VTRs, are exceptionally compliant with it. So even then, this would suggest that you wouldn't want to have to do that. You don't think that this is going to get a better aggregate data than asking people to fill out forms? With that, what I would direct the Court to, since I see them quickly running out of time, is the discussion in the Mexican Gulf fishing case. And with permission, Judge, may I finish? The discussion in the Mexican Gulf fishing case, it was an Administrative Procedure Act case, but the question still there was whether or not 24-7 tracking, in that case it was, I think, a commercial, a different type of boat, whether or not it was necessary to actually go forward and protect the stock and the fishers down in the Gulf of Mexico. The Court in that case took a very, very close look, and they put the government to task in every single one of those. That was an Administrative Procedure Act case, but I would submit to the Court that we should not be looking harder in an APA challenge than we should be looking at a challenge under the Fourth Amendment to the U.S. Constitution. So that's how I would answer that question to Judge Aframe. Thank you. Thank you, Counsel. That concludes argument in this case.